UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| J & L FAMILY, LLC | CIVIL ACTION NO. 16-cv-1193 |
| VERSUS | JUDGE FOOTE |
| BHP BILLITON PETROLEUM PROPERTIES (N A), LP, ET AL | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM ORDER

**Introduction**

Before the court are two motions: (1) Motion to Compel filed by J&L Family, LLC ("J&L") (Doc. 84) and (2) Motion to Limit Discovery or For Protective Order filed by BHP Billiton Petroleum Properties, et al ("BHP") (Doc. 87). The motions are granted in part and denied in part as set forth below.

**Factual Background**

J&L is an unleased mineral owner in a force-pooled unit operated by BHP. BHP is a subsidiary of Petrohawk Energy Corporation ("Petrohawk"). In or around the period of 2007 to 2010, Petrohawk made a decision to construct a gas gathering pipeline system to serve various wells that operated in northwest Louisiana. Petrohawk did so through a wholly-owned subsidiary named Hawk Field Services, LLC ("Hawk"). In April to May of 2010, Petrohawk, Hawk and other affiliates entered into a series of related transactions with affiliates of Kinder Morgan, Inc. ("Kinder Morgan") that included a Gas Gathering Agreement. The Gas Gathering Agreement included a

commitment of all of Petrohawk's gas in the Haynesville Shale area and fixed fees for gathering and treating the gas. The fees were subject to an annual escalation based on the Consumer Price Index, and Petrohawk made minimum volume commitments that required it to pay a minimum fee regardless of the amount of gas it moved through the system.

J&L contends that, as part of the above transactions, Petrohawk and its affiliates sold the gas gathering system to a newly formed entity named Kinderhawk for $875,000,000 and received the right to participate as a 50% owner in Kinderhawk on a going forward basis. J&L contends that this position gave Petrohawk a significant economic interest on the opposite side of the Gas Gathering Agreement. J&L also contends that Petrohawk did not have the typical incentives of an operator. This is so, J&L argues, because each increase to the long-term gathering costs under the Gas Gathering Agreement, which Petrohawk charged through to interest owners in the units, was offset by other benefits which Petrohawk did not share with the interest owners, namely: (a) the increased cash price paid to Petrohawk and its affiliates for the gathering system; and (b) the resulting increased revenues and asset values attributable to Petrohawk's interest in Kinderhawk going forward. A year later, Petrohawk sold its remaining 50% interest in Kinderhawk to Kinder Morgan.

J&L contends that each added cent of charges incurred under the Gas Gathering Agreement represented a cost that Petrohawk (and its successor BHP), passed on to J&L. Each additional cent of such charges increased the revenues and value of Kinderhawk, resulting in substantial economic benefits that Petrohawk did not share

with J&L. As a result, J&L argues, the gathering charges Petrohawk has billed to J&L are inflated.

The discovery at issue relates to J&L's claims against BHP regarding post-production costs which BHP has applied to J&L's interest in the five wells that are the subject of this lawsuit. J&L served discovery requests seeking information pertaining to policies and procedures, analysis, and shareholder or investor reports that related to BHP's decision making process in procuring pipeline services, constructing or acquiring pipeline services, and divesting their ownership in various pipeline and pipeline operating entities that handle J&L's share of unit gas. These specific requests are set forth in the following Requests for Production:

> **Request for Production No. 26 (procurement of gas gathering facilities in Haynesville and consideration of alternatives):**
>
> Produce any and all documents that describe or depict any communication between You and any affiliate of You or between or among Your employees or contractors, regarding: (a) policies, practices or strategies concerning the procurement, reservation, development or purchase of *gathering, treatment and compression facilities* between the wellhead and interstate pipeline interconnects in the Haynesville Shale Production Area; (b) analysis, discussion or consideration of alternatives for procurement, reservation, development or purchase of gathering, treatment and compression facilities between the wellhead and interstate pipeline interconnects in the Haynesville Shale Production Area; and (c) reports to investors or shareholders regarding any of the foregoing from January 1, 2008, to the present. (Italics added.)
>
> **Request for Production No. 27 (procurement of transportation capacity in Haynesville and consideration of alternatives):**
>
> Produce any and all documents that describe or depict any communication between You and any affiliate of You or between or among Your employees or contractors, regarding: (a) policies, practices or strategies concerning the procurement, reservation, development or purchase of *transportation capacity* for gas from the tailgate or terminus points of gathering systems in

the Haynesville Shale Production Area to delivery or sale points outside the Haynesville Shale Production Area; (b) analysis, discussion or consideration of *alternatives* for the procurement, reservation, development or purchase of *transportation capacity* for gas from the tailgate or terminus points of gathering systems in the Haynesville Shale Production Area to delivery or sale points outside the Haynesville Shale Production Area; and (c) reports to investors or shareholders regarding any of the foregoing, from January 1, 2008, to the present. (Italics added.)

**Request for Production No. 28** (sale of gas gathering facilities in Haynesville and consideration of alternatives):

Please produce any and all documents that describe or depict any communication between You and any affiliate of You or between or among Your employees or contractors, regarding (a) policies, practices or strategies concerning the divestment or *sale* of gathering, treatment or compression facilities in the Haynesville Shale Production Area, or of ownership interests in entities owning, operating or management such gathering, treatment or compression facilities; (b) analysis, discussion or consideration of *alternatives for sale* of gathering, treatment or compression facilities in the Haynesville Shale Production Area, or of ownership interests in entities owning, operating or management such gathering, treatment or compression facilities; and (c) reports to investors or shareholders regarding any of the foregoing, from January 1, 2008, to the present; and (d) if a sale or other divestment of such facilities occurred, copies of all documents, agreements or contracts relating to or evidencing the sale or divestment. (Italics added.)

**Request for Production No. 38** (procurement of gas gathering facilities related to the subject wells and consideration of alternatives):

Produce any and all documents that describe or depict any communication between You and any affiliate of You or between or among Your employees or contractors, regarding: (a) policies, practices or strategies concerning the procurement, reservation, development or purchase of gathering, treatment and compression facilities between the wellhead and interstate pipeline interconnects as *related to the Subject Wells*; (b) analysis, discussion or consideration of alternatives for procurement, reservation, development or purchase of gathering treatment and compression facilities between the wellhead and interstate pipeline interconnects for product produced from the Subject Wells; and (c) reports to investors or shareholders regarding any of the foregoing, from January 1, 2008, to the present. (Italics added.)

Doc. 84-1, pp. 10 and 11.

**The Discovery Dispute**

BHP argues that the central dispute in this case is whether Louisiana law authorizes BHP's allocation of certain costs to J&L's unleased interest in the five wells. BHP argues that it has already produced the documents regarding the negotiation of the transaction that formed the basis of J&L's claims, i.e., the 2010 Formation and Contribution Agreement and the Gas Gathering Agreement with Kinderhawk. BHP argues that J&L's additional complaints related to the cost and analysis of a decision to construct a gas gathering system, the formation of Hawk Field, and the divestment of the Haynesville gas gathering assets have no bearing on the costs that were assessed against J&L's interest and, therefore, are simply irrelevant. BHP argues that there is no link between the construction cost of the gathering system and the production and post-production costs assessed to J&L's interest.

J&L argues that the gathering, treating, compression and related charges applied by BHP to J&L's interest are unlawful and were the product of an affiliated Gas Gathering Agreement in which the terms were designed to enhance the value received by Petrohawk at the expense of the interest owners within the units. Because Petrohawk passed through costs related to the Gas Gathering Agreement, J&L argues, the analysis and reasons behind Petrohawk's gathering and divestment decisions will make the claims asserted by J&L more or less probable and assist in the resolution of determining whether the resulting costs are improper.

J&L argues that because Petrohawk was on both sides of the agreement (on the operator's side and the gatherer's side), Petrohawk had a significant economic interest to make the terms of the Gas Gathering Agreement very beneficial to the gatherer, because for each long-term gathering cost or minimum volume commitment, Petrohawk benefitted from its 50% interest in Kinderhawk. Doing so also increased valuation of the asset to Petrohawk when that interest was divested.

J&L argues that this increased value is directly related to the information requested regarding Petrohawk's plan to build and monetize this system. According to J&L, any and all analysis that went into the creation of the system, divestment, and fixing the terms of the Gas Gathering Agreement is relevant to the issue of how Petrohawk profited from the transactions and divestment. J&L emphasizes that Petrohawk's considerations in deciding to build the gathering system and immediately turn around and create new terms for a long-term gathering contract for divestment drives right to the heart of the propriety of such costs under the law.

J&L also argues that the transactions have cost J&L significant sums of money. J&L states that none of the wells which were drilled after the Kinderhawk Gas Gathering Agreement have ever reached payout. J&L states that discovery has shown that post-production marketing has comprised almost 65% of gross revenue for 2016 on two of the wells at issue. According to J&L: "This is not normal, and J&L has a right to discover Petrohawk's motivations in orchestrating the gathering system in terms it chose, before Petrohawk's quick, but graceful, exit from the gathering business with 1.9 billion dollars in proceeds." Doc. 92 at p. 9.

**Analysis and Conclusion**

After careful review of the parties' numerous briefs addressing this discovery dispute, the court finds that J&L is entitled to discover the documents and communications containing or reflecting Petrohawk's analysis, strategies, and business rationale for deciding to build the Hawk Field gas gathering system in the Haynesville, including the consideration of the alternatives available at that time. The court presumes that Petrohawk (or BHP) has already produced all relevant, non-privileged information pertaining to the negotiation or determination of the fees charged to J&L under the gas gathering agreement. But Petrohawk's decision to construct a gas gathering system, when other cheaper alternatives may have been available, is highly relevant to whether the fees charged to J&L's interest were reasonable. Of course, this includes documents and communications that predate the confection of the Kinderhawk agreements in April-May 2010.

This discovery is necessarily limited geographically, because the discovery only pertains to the gas gathering system that was used to service the five J&L wells at issue in this lawsuit. The discovery is also limited temporally, because the time frame is limited to the lead up to the decision to construct the system.

However, J&L's proposed discovery regarding Petrohawk's decision to divest its gas gathering assets hits up against the proportionality framework which is now at the forefront of Rule 26's provisions. Fed. R. Civ. P. 26(b)(1). Under Rule 26, a request

must be proportional to the needs of the case when considering, "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." <u>Star Creek Center, LLC v. Seneca</u>, 2018 WL 1934084, at *4 (E.D. Tex. Apr. 23, 2018).

The Advisory Committee Comments to the 2015 amendment to Rule 26 make clear that the parties and the court have a collective responsibility to ensure that discovery is proportional. The party claiming it would suffer an undue burden or expense is typically in the best position to explain why, while the party claiming the information sought is important to resolve the issues in the case should be able "to explain the ways in which the underlying information bears on the issues as that party understands them." <u>Id</u>. "The court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." <u>Id</u>; <u>Kalencom Corp. v. Shulman</u>, 2018 WL 1806037, at *2 (E.D. La. Apr. 17, 2018).

Simply stated, there likely were many different reasons, financial or otherwise, why Petrohawk decided to divest itself of the gas gathering system. But what really matters at the end of the day is whether the charges imposed on J&L were reasonable. Accordingly, any discussions regarding divestment that began *after the negotiation and determination of the fees charged to J&L under the gas gathering agreement* are too far removed from that inquiry to pass the test of proportionality.

But if Petrohawk contemplated the divestment at any time prior to the time the fees to be charged to J&L were determined, then any discussions between or among Petrohawk and its affiliates regarding that divestment are fair game as those discussions could very well shed light on the various factors that went into the fees charged to J&L. In other words, if the formation of the system, retaining a 50% interest, and the ultimate sale of the system were all contemplated from day one, then J&L should be allowed to explore the analysis and rationale for the sale as that information may well have impacted the fees charged to J&L.

The parties are expected to cooperate in good faith to limit the search terms, time frames, and document/computer custodians to carefully minimize the burden on Petrohawk and BHP as these issues are explored further.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 2nd day of May, 2018.

                                            Mark L. Hornsby
                                            U.S. Magistrate Judge